# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| Mark S. Garris, | : | Case No. 3:07CV3292 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security Administration, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeal's Council's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*. Pending are issues arising from the Briefs of the parties and Plaintiff's Reply (Docket Nos. 18, 19 and 20). For the reasons set forth below, the Commissioner's decision is affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for Title II DIB and Title XVI SSI on August 28, 2003, alleging that he had been disabled since September 15, 2002 (Tr. 95-97, 419-420). The applications were denied initially

and upon reconsideration (Tr. 61-64, 57-59; 424-427, 435-437).  Plaintiff requested an administrative hearing, and on March 23, 2006, Administrative Law Judge (ALJ) Yvonne Stam conducted such hearing by video.  Plaintiff, represented by counsel, and Vocational Expert (VE) Christopher Young appeared and testified at the hearing (Tr. 456).  The ALJ issued an unfavorable decision on February 27, 2007 (Tr. 19).  The Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's decision the Commissioner's final decision (Tr. 3-5).

## JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).

## FACTUAL BACKGROUND

*Plaintiff's Testimony*

On March 23, 2006, Plaintiff resided alone.  He reported  earnings in 2003 for one day of employment at McDonalds®.  He was unable to  produce a physician's statement that he was taking a diuretic; consequently,  he was terminated by  his employer for taking frequent bathroom breaks (Tr. 459-460).  In 2002 and 2001, Plaintiff was employed by Burger King® /Great Lakes' Restaurants of Ohio (Tr. 460, 462).  Plaintiff was employed at Burger King® on a part-time basis for "a couple of years."  Overall, Plaintiff's employment records were replete with short-term work (Tr. 461).

Plaintiff had a broken wrist, mouth ulcers, chronic bronchitis, problems with his left ankle, difficulty breathing and carpal tunnel syndrome.  He diagnosed himself with restless leg syndrome (Tr. 465, 466, 473).

His arm became numb and it was often the site of pain (Tr. 474). He had heart palpitations when his blood pressure was elevated and he had flat feet (Tr. 475). He was prescribed an antidepressant, a mood stabilizing medication, a sleep aid and a medication to control hypertension. The side effects of the medications included ulcerated lesions in his mouth, cracks in his feet, crusty skin and an inability to harness his anger (Tr. 467, 470, 471). He admitted, however, that the medication for his "mental problems" made him feel better (Tr. 470).

Plaintiff's ability to work was impeded by his inability to stand for more than 45 minutes (Tr. 464-465). He could lift fifty pounds (Tr. 476). He became uncomfortable if he sat too long (Tr. 465). He could not straighten his fingers and their mobility and dexterity were limited (Tr. 468, 469, 472-473). He had difficulty writing because of the limited use of his right hand (Tr. 469, 472). He did, however, use his left hand to compensate, in part, for the problems arising from the inability to use his right hand (Tr. 470, 472).

*VE's Testimony*

The VE assumed that if Plaintiff could only lift twenty pounds occasionally, ten pounds frequently and he needed to sit at will and might have difficulty maintaining a standing position for more than 25 minutes at a time, Plaintiff would be precluded from performing his past relevant work.

The VE also assumed that a claimant of Plaintiff's age, education and past work experience, capable of occasionally lifting fifty pounds, frequently lifting twenty-five pounds, standing and walking in combination for six hours and sitting for six hours, could perform Plaintiff's past relevant work (Tr. 477). In addition, the light, unskilled level of work that the claimant could perform would include a rural mail carrier, sub assembler and survey worker. There were approximately 350 mail carrier jobs in the greater

Toledo metropolitan area, 1,750 assembler jobs and approximately 550 survey worker positions (Tr. 478).

If the claimant were limited in fine finger manipulation, the sub assembler would no longer be a viable alternative for the claimant; however, the claimant could perform work as a parking lot attendant. There were approximately 250 such jobs in the area (Tr. 478, 479). If Plaintiff's fine finger manipulation were limited to occasional use, none of the aforementioned jobs would be suitable.

If the claimant were limited in grasping and occasional fine finger manipulation, there would be jobs that the claimant could perform: security guard, assembly machine operator and maid. There were approximately 275 security guards, 200 assembly machine operators and 400 maid jobs that could be done without grasping as long as one had the grip to maintain and hold objects.

For an individual limited to standing not more than 45 minutes, the maid position would be excluded from the pool of possible jobs that the claimant could perform (Tr. 479). However, the claimant could perform work as a wire worker. There were 500 such positions (Tr. 480). The security guard position would not be eliminated if the claimant had only superficial interaction with co-workers and supervisors (Tr. 480). The tolerance for absence would be limited to one day per month (Tr. 481).

## MEDICAL EVIDENCE

1.  **Dr. A. K. Bhaiji.**

Dr. Bhaiji diagnosed Plaintiff with bipolar disorder, arthritis and a history of bilateral shoulder dislocations. Dr. Bhaiji opined that Plaintiff would not have difficulty with work related physical activities such as sitting or standing or walking. He could have difficulty lifting, carrying and handling objects, speaking and traveling (Tr. 220).

Dr. Bhaiji found that Plaintiff's shoulders, elbows, wrists, fingers, hips, knees, feet and great toe could only rise against gravity, not against maximal resistance. Plaintiff's grasp, manipulation, pinch and fine coordination were all within normal limits (Tr. 221). The range of motion in Plaintiff's cervical spine, elbows, hands/fingers, dorsolumbar spine, knees and ankles was normal but the range of motion in Plaintiff's shoulders, wrists and hips was below normal (Tr. 222, 223, 223A).

**2.     Dr. David R. Hauser, Doctor of Podiatric Medicine.**

When Plaintiff commenced the course of treatment, his skin was dried and cracked. In October and December 2004, Dr. Hauser debrided Plaintiff's cracked feet and commenced the application of a topical ointment (Tr. 361, 362). Some of the callused areas of the feet were debrided on January 27, 2005 and in March, Dr. Hauser addressed the recurrent ulcerated fissure on Plaintiff's heal (Tr. 360). From May through February 2006, Dr. Hauser found new fissures opening up on Plaintiff's feet. He aggressively debrided the fissured areas and cauterized them with silver nitrates (Tr. 352 - 358).

**3.     Medical University of Ohio/Medical College of Ohio.**

On May 18, 2004, Plaintiff was diagnosed with severe left carpal tunnel syndrome (Tr. 349). In July 2004, Plaintiff's elevated liver enzymes were suggestive of hepatitis C (Tr. 387, 388). The proportion of blood volume consisting of red blood cells was less than normal on June 9, 2004 (Tr. 386). The X-rays administered on September 2, 2004, showed a normal right knee (Tr. 346, 347). Plaintiff was prescribed an antibiotic for treatment of infected feet (Tr. 345). Plaintiff underwent removal of fluid on his right knee in October 2004 (Tr. 273). On October 25, 2004, the results from x-rays of Plaintiff's right shoulder, elbow, wrist and hand were all negative (Tr. 351). In December 2004, Plaintiff underwent  a proximal row

5

carpectomy (excision of a carpal bone) after sustaining a lunate dislocation of the right wrist (Tr. 374).

On January 26, 2005, Plaintiff was treated in the Medical College of Ohio Emergency Room for right wrist pain and contusion after a fall (Tr. 370). A follow-up visit was scheduled for January 28, 2005. In February 2005, Percocet was prescribed to relieve Plaintiff's pain from the lunate dislocation (Tr. 368). Plaintiff was prescribed a decongestant upon being diagnosed with a viral upper respiratory infection on February 6, 2005 (Tr. 344). In March, April and May 2005, Plaintiff underwent right wrist irrigation and debridement to prevent chronic infection (Tr. 299-301, 307-308). On July 18, 2005, Plaintiff underwent a right wrist fusion (Tr. 295). In August 2005, Plaintiff underwent joint fusion to correct the failed right wrist fusion (Tr. 291). A follow-up x-ray taken on September 30, 2005, showed a lack of approximation of the distal aspect of the plate along the third metacarpal; however, this result was not clearly seen on the October 28, 2005, x-ray.

During 2005, Plaintiff was treated also for right thigh pain. No acute bony abnormalities were noted during the examination conducted on August 1, 2005 (Tr. 341). Plaintiff's right elbow showed signs of some limited osteoporosis on September 17, 2005 (Tr. 334). The magnetic resonance imaging (MRI) of Plaintiff's left foot that was administered on October 5, 2005, revealed a severe case of flat feet (Tr. 246). In November 2005, Plaintiff was diagnosed with left ankle cartilage and bone defects, degenerative joint disease and flat foot. Treatment included possible fixed ankle-foot orthosis (Tr. 415). Plaintiff was encouraged, on January 9, 2006, to obtain an ankle fixation orthotic to reduce left ankle pain (Tr. 411). On February 2, 2006, X-rays revealed that the joint wrist fusion surgery had failed (Tr. 408, 410). On February 13, 2006, Plaintiff's wrist hardware and a wedge of bone near the damaged metacarpal from a previous

fusion were excised (Tr. 405-406).

**4.     Mental Residual Functional Capacity Assessment.**

On October 23, 2003, Dr. Robert Gaffy, Ph. D., concluded that Plaintiff was moderately limited in his ability to complete a normal work week, interact appropriately with the general public, accept instructions and respond appropriately to criticism, get along with co-workers or peers without distracting them or exhibiting behavioral extremes and maintaining socially appropriate behavior (Tr. 174).

5.     **Neighborhood Health Association.**

On April 18, 2002, the treating physician addressed Plaintiff's sleeping problems and wrist and ankle pain by prescribing drug therapy (Tr. 189). On September 3, 2002, Plaintiff complained about the side effects of Zoloft and he was prescribed Paxil instead (Tr. 187).

On March 5, 2003, Plaintiff was referred to a dentist for mouth pain which had persisted for two months (Tr. 182). In July 2003, he reported a right knee injury that occurred on the job. On August 6, 2003, Plaintiff's blood pressure was elevated but his heart and lungs were normal. He was prescribed Ibuprofen to reduce the severity of his right knee pain (Tr. 180).

On October 22, 2003, Plaintiff was treated for mouth ulcers (Tr. 185). On October 28, 2003, Plaintiff was prescribed medication for treatment of chronic gingivitis (Tr. 179A). On December 12, 2003, Plaintiff was prescribed medication for low back pain (Tr. 178).

In March 2004, Plaintiff continued treatment for gingivitis (Tr. 265). In April, the status of his hypertension was reviewed (Tr. 264). Medication was prescribed to treat hayfever in May, 2004 (Tr. 263). A referral to specialists was made in September 2004 to address the plan of care for his carpal tunnel

syndrome and plantar wart on Plaintiff's foot (Tr. 260).

On February 4, 2005, Plaintiff's blood pressure was elevated and under poor control. The dosage of his medication was increased and lifestyle changes were recommended (Tr. 254). In November 2005, issues related to cracks in Plaintiff's mouth and tongue were addressed (Tr. 245). Plaintiff was treated for acid peptic disease on December 21, 2005 (Tr. 244).

**6.     Pathology Laboratories**

In February and March 2005, Plaintiff's fasting glucose levels were within the normal range of reference (Tr. 268, 269). Plaintiff's glucose levels exceeded the recommended range on August 31, 2005 (Tr. 266).

**7.     Physical Residual Functional Capacity Assessment.**

On April 17, 2004, Dr. Jerry McCloud opined that Plaintiff could occasionally lift and/or carry up to fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and engage in unlimited pushing and/or pulling (Tr. 225). There were no postural, manipulative, visual, communicative or environmental limitations (Tr. 226-227).

**8.     Psychiatric Review Technique Form.**

On October 23, 2003, Dr. Gaffy conducted a psychiatric review and diagnosed Plaintiff with components of an affective disorder characterized by disturbance of mood and a major depressive disorder (Tr. 163). He also found that Plaintiff had an intermittent explosive disorder (Tr. 167). Behavioral changes associated with cannabis abuse were evident (Tr. 168). Plaintiff had mild to moderate restrictions of

activities in daily living, difficulties in maintaining social functioning and maintaining concentration, persistence and pace (Tr. 170).

**9.      Riverside Hospital.**

On June 20, 1994, Plaintiff's liver battery results were within normal range (Tr. 397). The blood sample collected on February 6, 1995, showed a normally functioning liver (Tr. 395).

**10.     St. Anne Mercy Hospital**

On February 12, 2004, Plaintiff's liver function tests were within normal reference range (Tr. 392). Plaintiff's glucose levels exceeded slightly the normal range of on November 17, 2004 (Tr. 270).

**11.     St. Vincent Medical Center.**

On February 15, 2001, Plaintiff's liver enzyme levels exceeded the reference range (Tr. 390). The results of the liver function tests were normal on February 11, 2004 (Tr. 392).

**12.     Unison Behavioral Health Group.**

Licensed social worker, Tina Gould, interviewed Plaintiff on March 25, 2003, and diagnosed him with a major depressive disorder, recurrent, intermittent explosive disorder, cannabis abuse, bipolar disorder, antisocial personality disorder and some serious symptoms or a serious impairment in social, occupational, or school functioning (Tr. 242).

On April 7, 2003, Dr. Susa Trebbe-Haas concurred, in part, with Tina Gould's diagnosis of major depressive disorder, recurred, intermittent explosive disorder, cannabis abuse, antisocial personality disorder and serious symptoms or a serious impairment in social, occupational, or school functioning. In addition, Dr. Trebbe-Haas noted that Plaintiff suffered from hypertension, hepatitis C, arthritis, and had surgery to

9

remove a left arm tumor(Tr. 214). She then monitored and/or altered Plaintiff's prescriptions for medication designed specifically for treatment of his bipolar disorder in June and July 2003 (Tr. 211-212).

Dr. Mark Blair, a psychiatrist, acknowledged that Plaintiff had a Bipolar II Disorder, cannabis abuse and an antisocial personality disorder on December 1, 2003. Medication was prescribed to address Plaintiff's history of mood changes, irritability, anxiety and depression (Tr. 197). On January 14, 2004, Dr. Blair opined that Plaintiff's deficiencies included some social isolation and impulsiveness (Tr. 216). In April and July 2004, Dr. Blair noted that Plaintiff's medication appeared to control his episodes of depression. Plaintiff sustained full remission from polysubstance dependence (Tr. 235, 238). In October 2004, medication to control Plaintiff's irritability and help prevent manic symptoms was introduced into his medication regime (Tr. 233).

On December 16, 2004, Dr. Cedric Skillon observed that Plaintiff was without manic symptoms. Therefore, Plaintiff's diagnosis was changed to major depressive disorder, severe, recurrent, partial remission and antisocial personality disorder (Tr. 231).

Dr. Galina Zhurakovski opined that Plaintiff had a bipolar disorder for which she continued the prescription of two antidepressants at the same level on February 9, 2005 (Tr. 285, 286).

In September 2005, mood altering medications were prescribed (Tr. 280). In November 2005, Dr. Satwant Gill noted that Plaintiff had benefitted from seizure medication (Tr. 275).

## STANDARD FOR DISABILITY

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined

as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively:

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *[Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir.1990)]. *Id.*

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

Fifth, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F. 3d 585, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).

If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### **ALJ DETERMINATIONS**

After consideration of the entire record, the ALJ made the following findings:

1.    Plaintiff met the insured status requirements of the Act through December 2007.

2. Plaintiff had not engaged in substantial gainful activity since November 30, 2002, the amended alleged onset date.

3. Plaintiff had the following severe impairments: arthritis, hypertension and affective disorders. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity to lift/carry twenty pounds, frequently lift/carry ten pounds, stand/walk a maximum of 45 minutes at a time and sit up to six hours in an eight-hour workday, limited by maximum frequency limitations in fine finger manipulation. Plaintiff was limited to brief/superficial contact with the general public, co-workers and supervisors.

5. Plaintiff was unable to perform any past relevant work.

6. Plaintiff, a younger individual with a high school education and the ability to communicate in English, could perform jobs that exist in significant numbers in the national economy. Drug abuse and alcoholism were not contributing factors material to the determination of disability.

7. Plaintiff was not under a disability as defined in the Act from November 30, 2002, through the date of the decision or February 27, 2007.

(Tr. 22-30).

## **STANDARD OF REVIEW**

This Court exercises jurisdiction over the review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006). In reviewing claims under the Act, a district court does not review the matter *de novo. Id.* Instead, a district court is limited to examining the entire administrative record to determine whether the Commissioner's final decision is supported by *substantial evidence. Brown v. Commissioner of Social Security,* 2007 WL 4556678, *5 (N.D.Ohio 2007) (*citing Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984); 5 U.S.C. § 706(2)(E); 42 U.S.C. § 405(g)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*citing Richardson v. Perales,* 91 S. Ct. 1420,

1427 (1971)).  The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id.*  To determine whether substantial evidence exists to support the Commissioner's decision, a district court must not focus, or base its decision, on a single piece of evidence. Rather, a court must consider the totality of the evidence on record.  *Id.* (*citing Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews,* 574 F.2d 359 (6th Cir. 1978)).

When dealing with conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.* at *6.  To that end, the Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts."  *Id*. (*citing Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984)). Accordingly, for this Court to accept the ALJ's conclusions, it must only find that they are based on substantial evidence.  *Id.*

## DISCUSSION

**1.**     **Step Three of the Sequential Evaluation**

Plaintiff claims that this case is beyond meaningful appellate review because there was no discussion at Step three of the sequential evaluation of Section 1.07 of the Listing.

At step three of the five-step process used to evaluate SSI claims, the ALJ will make a finding of "disabled" if the claimant can demonstrate that his or her impairment meets the durational requirement and "meets or equals a listed impairment."  *Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001).  In this case, the ALJ specifically found that Plaintiff's impairments did not meet or equal any impairment listed in Subpart

P, Appendix 1 of the Social Security Regulations (Tr. 27).  According to Plaintiff, that finding is insufficient because the ALJ failed to analyze Plaintiff's claim that he meets or equals the criteria for Listing 1.07.  A claimant must satisfy all the criteria of a Listing to be found to have met or equaled a Listing.  *Hale v. Secretary of Health and Human Services,* 816 F.2d 1078, 1083 (6th Cir. 1987).  An impairment is "medically equivalent to a listed impairment in appendix 1 of subpart P of part 404 of this chapter if it is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a); 20 C. F. R. § 404.1526(a) (Thomson Reuters/West 2008).

Under Section 1.07, the claimant must have a fracture of an upper extremity with nonunion of a fracture of the shaft of the humerus (a bone of the arm articulating with the scapula above and the radius and ulna below); the radius (the lateral and shorter of the two bones of the forearm); or the ulna (the medial and larger of the two bones of the forearm).  20 C. F. R. Pt. 404, Subpt P, App. 1 (Thomson Reuters/West 2008); STEDMANS MEDICAL DICTIONARY (27th ed. 200).  The fracture must be under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function cannot be restored or expected to be restored within 12 months of onset.  20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters/West 2008).

A review of the medical evidence reveals that Plaintiff's wrist, the carpus, and the lunate, a carpal bone, as distinguished from the humerus, radius or ulna and lunate bones in the forearm, were the subject of countless surgeries and treatment (Tr. 287-300, 301, 303, 305-307, 309-310, 312, 314-325, 330, 332, 339, 349, 366-368, 370-378, 380-381, 400-402, 405-410).  When examined, Plaintiff's left upper extremity was unremarkable and the X-rays of Plaintiff's right shoulder and elbow were negative (Tr. 351).  The X-rays

of Plaintiff's elbow showed limited osteoporosis but no bony abnormality on September 17, 2005 (Tr. 334). Consequently, there is no evidence of a fracture of an upper extremity required to show the existence of an impairment under 1.07 of the Listing.  The ALJ's finding that Plaintiff's impairment does not meet one of the listed impairments 20 C. F. R. Part 404, Subpart P, Appendix 1 is accurate with respect to Section 1.07.

**2.      Step Five of the Sequential Evaluation**

Plaintiff's next argues that even if he could perform work as a wire worker, assembly machine operator position or security guard, these three potential occupations do not exist in significant numbers. In fact, there are only 975 jobs in the local economy.  Accordingly, the Commissioner failed to sustain the burden of proof at step five of the sequential evaluation.

The Magistrate finds that Plaintiff's challenge lacks  merit as 20 C. F. R. §§ 416.966 and 404.1566 provides that the Commissioner can consider work either in the region where the claimant lives or in several regions in the country, notwithstanding whether the work exists in the immediate area where the claimant resides, and irrespective of whether the work exists in the immediate area, whether the claimant would be hired or whether the vacancy exists.  Where there is testimony from a VE that a significant number of jobs exist for which the claimant is qualified, it is immaterial that the number is a small percentage of the total number of jobs in a given region.  *Hall v. Bowen*, 837 F. 2d 272, 275 (6th Cir. 1988).

There is no magical number that constitutes a "significant number" of jobs.  Instead, the decision must be made using the trial court judge's common sense in weighing the statutory language applied to the individual claimant's factual situation.  *Born v. Secretary of Health and Human Services*, 923 F. 2d 1168, 1174 (6th Cir. 1990).  Criteria to be considered include:  the level of claimant's disability; the reliability of

the VE's testimony; the reliability of the claimant's testimony; the distance claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such and work.

In the present case, the VE testified that there were 275 security guard, 200 assembly machine operator and 500 wireworker jobs. Plaintiff had no unique skills, limited experience as a crew worker in two fast food restaurants, and he was qualified to perform light work. There is no evidence that Plaintiff would be required to travel to obtain such employment or that jobs of this nature are isolated. Accepting the VE's contention that 975 jobs are available to Plaintiff, this number represents a significant number of jobs under these circumstances.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Dated: November 26, 2008